CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

OCT 14 2021

JULIA C. DUDLEY, CLERK
BY: s/ H. MCDONALD
      DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| MELVIN CLARK, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 4:20-cv-00063 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| STANLEY FURNITURE COMPANY, | ) | |
| LLC, *et al.*, | ) | By:   Hon. Thomas T. Cullen |
| | ) |        United States District Judge |
| Defendants. | ) | |

Several decades ago, Stanley Furniture Company, LLC ("SFC") allowed executives to defer compensation until their later working years, or even retirement. The deferrals were a good deal, accruing high interest on beneficial tax terms.

But the furniture business has fallen on hard times in recent years (at least in the United States), and the COVID-19 pandemic only compounded these economic woes. Even before the pandemic started, SFC had missed some of their scheduled deferred compensation payments. And once COVID-19 lockdowns began, Stone & Leigh, LLC ("S&L"), which owns an interest in SFC and is responsible for some of these deferred compensation payments, began missing payments too. Plaintiffs, all retired SFC executives, understandably asked the companies to resume payments. When these efforts proved futile, Plaintiffs brought this suit under the Employee Retirement Income Security Act of 1974 ("ERISA"), formally demanding their missed benefits payments, declaratory judgments ensuring their future payments, prejudgment interest, and attorneys' fees.

This matter is now before the court on Plaintiffs' motion for summary judgment. For

the reasons below, the court will grant that motion.

## I.   BACKGROUND

Plaintiffs are all retired SFC business executives.[1] During their years working at SFC, each individual Plaintiff deferred some compensation in exchange for cash benefit payments which would be paid years, or even decades, later. In 2018, S&L purchased several assets from SFC and, as part of this deal, accepted some of SFC's deferred compensation obligations.

Since then, SFC and S&L have administered the contested deferred compensation plans. SFC administers the Stanley Interiors Corporation Deferred Capital Enhancement Plan ("DCP") (together, the "Stanley Defendants"), and S&L administers the Supplemental Retirement Plan of Stanley Furniture Company, Inc. ("SERP") (together, the "S&L Defendants").[2]

The parties stipulate to several key facts. First, there is no dispute that each Plaintiff is entitled to deferred compensation under the DCP and/or the SERP. Second, at the time Plaintiffs moved for summary judgment, the parties agreed on how much each plan owed its respective beneficiaries. SFC began to miss deferred compensation payments in 2019, paid each of the Stanley Plaintiffs only $500 in 2020, and has yet to make a payment in 2021. (Mem. in Supp. of Mot. for Summ. J. ("SJ Mem.") at 3 [ECF No. 108].) The parties agree that the

---

[1] Plaintiff Herman Ellsworth Haley, Jr., passed away during the pendency of this litigation. In their summary judgment briefing, the parties contested whether Plaintiffs could substitute Haley's wife, Phyllis Haley, for him under Federal Rule of Civil Procedure 25(a)(1). The court granted a separately filed motion to substitute (ECF No. 113) on September 8, 2021, via an oral order (ECF No. 115), so Mrs. Haley—in her capacity as executor—is now a plaintiff in this case.

[2] Some Plaintiffs are suing only the Stanley Defendants, and others are suing both pairs of defendants. Although the groups overlap considerably, they are not identical. Where precision is important, this opinion refers to the executives suing the Stanley Defendants as the "Stanley Plaintiffs" and to the executives suing the S&L Defendants as the "S&L Plaintiffs."

amounts owed to each plaintiff by the DCP and the SERP are:

| Plaintiff Name | Undisputed Annual DCP Payment | Undisputed DCP Payments Owed to Date |
|---|---|---|
| Jay N. Busey | $10,000.00 | $23,250.00 |
| Kelly S. Cain | $10,000.00 | $23,250.00 |
| Jeese V. Cannaday | $17,000.00 | $39,875.00 |
| Melvin Clark | $19,200.00 | $45,100.00 |
| Charles William Cubberley, Jr. | $14,833.33 | $34,727.92 |
| Calvert Fulcher, Jr. | $17,400.00 | $40,825.00 |
| Herman Ellsworth Haley, Jr. | $19,475.00 | $43,675.00 |
| John W. Johnson | $25,833.33 | $59,903.59 |
| Dave P. Maddox | $14,000.00 | $32,750.00 |
| John Hart Matthews | $17,500.00 | $6,062.50 |
| Douglas I. Payne | $12,000.00 | $28,000.00 |
| William G. Perdue | $11,520.83 | $26,861.97 |
| William A. Sibbick, Jr. | $10,000.00 | $23,250.00 |
| Robert J. Smith | $10,000.00 | $23,250.00 |
| Alexander Teglas, Jr. | $17,583.00 | $41,259.63 |
| Robert Anthony Vanore | $22,000.00 | $29,750.00 |
| Larry E. Webb, Jr. | $34,800.00 | $82,150.00 |
| **TOTAL** | **$283,145.49** | **$603,940.61** |

| Plaintiff Name | Undisputed Monthly SERP Payment | Undisputed SERP Payments Owed to Date |
|---|---|---|
| Jay N. Busey | $102.42 | $1,382.67 |
| Kelly S. Cain | $174.69 | $2,358.32 |
| Jeese V. Cannaday | $702.08 | $9,478.08 |
| Melvin Clark | $215.93 | $2,915.06 |
| Charles William Cubberley, Jr. | $683.48 | $9,226.98 |
| Calvert Fulcher, Jr. | $713.19 | $9,628.07 |
| Herman Ellsworth Haley, Jr. | $753.42 | $7,157.49 |
| John W. Johnson | $760.48 | $10,266.48 |
| Dave P. Maddox | $162.30 | $2,191.05 |
| Douglas I. Payne | $256.34 | $3,460.59 |
| William G. Perdue | $114.36 | $1,543.86 |
| Robert J. Smith | $265.06 | $3,578.31 |
| Alexander Teglas, Jr. | $144.26 | $1,947.51 |
| Larry E. Webb, Jr. | $1,315.63 | $17,761.01 |
| **TOTAL** | **$6,363.64** | **$82,895.48** |

Setting these stipulated facts aside, two issues remain. First, the Stanley Defendants argue that the plain language of their plan empowers them to curb benefits during financially stressful times; in sum, they contend the plans themselves contemplate the nonpayment. Second, all Defendants argue that the COVID-19 pandemic has made it impossible for them to perform their contractual obligations under the plans. As a result, they maintain that their performance can be excused. Plaintiffs contest both positions and seek damages equal to what they are owed, plus prejudgment interest and attorneys' fees, as well as declaratory judgments establishing their entitlement to future benefits.

## II.    STANDARD OF REVIEW

Under Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets that burden, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn*, 710 F.3d at 213 (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. The nonmoving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Glynn*, 710 F.3d at 213 (quoting *Anderson*, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. *World-Wide Rights Ltd. P'ship v. Combe, Inc.*, 955 F.2d 242, 244 (4th Cir. 1992).

# III.   ANALYSIS

## A.  The Benefits Plans

The parties agree that ERISA covers the DCP and the SERP. Courts construe ERISA plans "according to the ordinary principles of contract law." *M & G Polymers USA, LLC v. Thackett*, 574 U.S. 427, 435 (2015). The court must first look to the contract's language; if the language is "clear and unambiguous, [the contract's] meaning is to be ascertained in accordance with its plainly expressed intent." *Id.* (quotation omitted). If an ERISA plan is ambiguous, courts construe the plan against the drafter and in line with the insured's reasonable expectations. *Jenkins v. Montgomery Indus., Inc.*, 77 F.3d 740, 743 (4th Cir. 1996).

The DCP explains how future employee benefits are calculated (*see* DCP at 3–14 [ECF. No. 24-1]) and includes a plan summary (*see id.* at 15–27). The Stanley Defendants cite three different sentences from the plan and its attached summary to support their position that they have no obligation to pay the Stanley Plaintiffs' benefits, given their recent business struggles. Under the heading "Unsecured General Creditor[s]" the DCP provides that:

> Participants and their beneficiaries, heirs, successors and assigns shall have no legal or equitable rights, interests, or other claims in any property or assets of the Employer. . . . Employer's obligation under the Plan shall be that of an unfunded and unsecured promise of Employer to pay money in the future.

(*Id.* at 13.) In other words, in the event of a bankruptcy, the plan beneficiaries will receive a portion of their expected deferred compensation only if the Stanley Defendants can satisfy their secured creditors first. (*See id.*) But the statement that plan beneficiaries "shall have no legal or equitable rights, interests, or other claims in any property or assets of the Employer" does not mean that an economic downturn suspends the Stanley Defendants' deferred

compensation obligations. (*Id.*) It simply provides that the plan beneficiaries are unsecured creditors of the company, and it describes their attendant priority in bankruptcy proceedings.

The other excerpts relied on by the Stanley Defendants come from the plan summary. As an initial matter, that summary advises that, "if there is any discrepancy between this summary and the plan document, your right to benefits shall be governed by the plan document." (*Id.* at 16.) Thus, to the extent that Defendants argue that the summary diminishes Plaintiffs' rights to deferred compensation, as established by the DCP's terms—and, in turn, Defendants' obligation to provide deferred compensation—that position is belied by the plain and unambiguous terms of the summary itself.

But even on their own terms, the summary excerpts do not reach economic downturns. The first statement, like the statement cribbed from the plan, contemplates bankruptcy. Under a heading reading "UNSECURED CREDITOR," the summary explains that "[a] participant in a non-qualified deferred compensation plan is an unsecured creditor of the Company. Thus, in the unlikely event of a financial disaster to the Company, your deferred compensation may be lost." (*Id.* at 19.) This language simply reinforces the beneficiaries' status as unsecured creditors and does not reach the situation at bar.

Third, the Stanley Defendants point to language that advises plan beneficiaries that their benefits "cannot be guaranteed." But this excerpt, also from the plan summary and not the DCP, anticipates changes to tax laws. In response to the posed question "ARE THESE BENEFITS GUARANTEED?" the first full paragraph explains, in relevant part:

> The Company is only able to offer these exceptional rates of return because of its ability to realize favorable investment returns under the existing tax laws. The company reserves the right to reduce the rates of return in the event that tax laws

> change in the future. Thus, the benefits described above cannot
> be guaranteed.

(*Id.* at 24.) Although the Stanley Defendants would like the court to read the last sentence divorced from the paragraph that contains it, it is clear that this language refers to changes in tax policy, not an unfortunate economic environment. Cherry-picking language and divorcing it from its obvious intent violates basic norms of contract interpretation. *See Brucker v. Taylor*, No. 1:16-cv-01414, 2017 WL 11506333, at *5 (E.D. Va. Mar. 28, 2017) ("[C]ontracts must be construed as a whole.") (quoting *TM Delmarva Power, LLC v. NCP of Va., LLC*, 557 S.E.2d 199, 200 (Va. 2002)).

The statements the Stanley Defendants rely on do not contemplate the kind of temporary economic downturn SFC has experienced during the COVID-19 pandemic. They are concerned with bankruptcy and tax issues. But even if language in the plan summary conflicted with the DCP's terms, the DCP would control. (*See* DCP at 16.) And the DCP requires that the beneficiaries be paid what they are owed.

For these reasons, the Stanley Defendants' arguments about the DCP's plain language fail.[3]

## B. Impossibility

Both the Stanley Defendants and the S&L Defendants raise the impossibility doctrine to excuse their failure to meet their deferred compensation obligations.[4] "To prove the defense

---

[3] The S&L Defendants do not make any plain language arguments regarding the SERP in their opposition to summary judgment motion. Any such argument is therefore waived. *Cox v. SNAP, Inc.*, 859 F.3d 304, 308 n.2 (4th Cir. 2017).

[4] The court assumes that impossibility is an affirmative defense available to defendants in ERISA cases. Courts construe ERISA plans "according to the ordinary principles of contract law." *M&G Polymers USA v. Thackett*, 574 U.S. 427, 435 (2015). And "[t]he defense of impossibility of performance is an established principle of

of impossibility of performance, a defendant must prove: (1) the unexpected occurrence of an intervening act; (2) such occurrence was of such a character that its non-occurrence was a basic assumption of the agreement of the parties; and (3) the occurrence made performance impracticable." *CMA CGM S. A. v. Leader Int'l Express Corp.*, 474 F. Supp. 3d 807, 817 (E.D. Va. 2020) (citing *Fla. Power & Light Co. v. Westinghouse Elec. Corp.*, 826 F.2d 239, 264 (4th Cir. 1987)). "In considering the non-occurrence of an event, the question is whether the event is 'one which the parties could reasonably be thought to have foreseen as a real possibility which could affect performance.'" *Id.* (quoting *Opera Co. of Boston v. Wolf Trap Found.*, 817 F.2d 1094, 1102 (4th Cir. 1987)). Despite this general language, courts usually limit impossibility to three specific circumstances: (1) the supervening death or incapacity of a person necessary for performance; (2) the supervening destruction of a specific thing necessary for performance; and (3) the supervening prohibition or prevention by law. Restatement (Second) of Contracts § 261 cmt. a  (Am. Law Inst. 1981). Only the third circumstance is arguably applicable here.

Impossibility due to a supervening government order usually applies if a government act directs or prohibits certain conduct. "[T]he fact that it is still possible for a party to perform if he is willing to break the law and risk the consequences does not bar him from claiming discharge." *See id.* For example, an order criminalizing furniture sales would make performance legally impossible. Alternatively, the government might instruct merchants to sell their wares

---

contract law." *Hampton Roads Bankshares, Inc. v. Harvard*, 781 S.E.2d 172, 177 (Va. 2016). That said, the court and the parties have located only one other case considering this specific question. *Lee v. Equity Props. Asset Mgmt., Inc.*, 2015 WL 6956556, at *15 (M.D. Fla. Nov. 10, 2015) (court rejected defendant's impossibility defense at summary judgment). But federal courts regularly apply other doctrines that excuse contract performance to ERISA cases. *See, e.g., Barron v. UNUM Life Ins. Co. of Am.*, 260 F.3d 310, 312, 317–18 (4th Cir. 2001) (upholding exchange of one-time payment from plan to beneficiary for general release from future payment obligations); *McInnis v. Provident Life & Accident Ins. Co.*, 853 F. Supp. 880, 882 (M.D.N.C. 1993) (denying benefits claim for claimant's failure to satisfy a condition precedent).

to the government, forcing them to breach pre-existing contracts. *See id.* § 264 ill. 6. Either way, the Restatement contemplates more than a "[g]overmental action that has the indirect effect of making performance more burdensome." *See id.* § 264 cmt. b.

Defendants argue that Virginia's shut-down orders in response to COVID-19 limited their business opportunities and made performance of their deferred compensation obligations impossible. On March 12, 2020, the Hon. Ralph S. Northam, Governor of Virginia, declared a state of emergency as a result of the COVID-19 outbreak. Va. Exec. Order No. 51 (Mar. 12, 2020).[5] For at least a portion of the pre-vaccine pandemic, Virginia required all non-essential brick-and-mortar retailors to "limit all in-person shopping to no more than 10 patrons per establishment." Va. Second Am. Exec. Order No. 52 (May 4, 2020). These orders coincided with dramatic cost cutting at SFC, which shut down all of its U.S. operations and either furloughed or laid off its entire workforce as Virginia and the country locked down. (*See* Dep. of Walter August Blocker ("SFC 30(b)(6) Dep."), 17:21–18:20, June 30, 2021.)[6]

Rather than commandeering Defendants' inventory or outlawing furniture sales altogether, Virginia's orders only made performance more difficult. But courts have applied a general rule that "[e]conomic hardship, even to the extent of bankruptcy or insolvency, does not excuse performance." *Ebert v. Holiday Inn*, 628 F. App'x 21, 23–24 (2d Cir. 2015) (order); *see also Bistro of Kan. City, Mo., LLC v. Kan. City Live Block 125 Retail, LLC*, No. ELH-10-2726, 2013 WL 4431292, at *34 (D. Md. Aug 16, 2013). This general rule has been extended to the

---

[5] Governor Northam's executive orders can be found at: https://www.governor.virginia.gov/executive-actions/ (last visited Oct. 7, 2021).

[6] Several depositions requested by the court were never publicly filed by the parties. They are available in the court records.

COVID-19 pandemic. *See, e.g.*, *Dominion Energy Cove Point LNG, L.P. v. Mattawoman Energy, LLC,* No. 1:2-cv-611, 2020 WL 9260246, at *8 (E.D. Va. Oct. 20, 2020) (rejecting a party's COVID-19 related impossibility defense); *Gap Inc. v. Ponte Gadea N.Y. LLC,* No. 20 CV 4541, 2021 WL 861121, at *10 (S.D.N.Y. Mar. 8, 2021) (same, and collecting cases).

For these reasons, there is no genuine dispute of a material fact regarding the impossibility defense. The defense does not apply. The government orders at issue did not make performance impossible. Therefore, the court will grant summary judgment to Plaintiffs on their benefits claims.[7]

## C. Declaratory Relief

Plaintiffs also seek declaratory judgments confirming their rights to deferred compensation payments from each Defendant indefinitely.

The Declaratory Judgment Act allows the court to "declare the rights and other legal relations of an interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a); *see also* 29 U.S.C. § 1132(a)(1)(B) (ERISA plaintiffs may seek declaratory relief "to clarify [their] rights to future benefits under the terms of the plan"). Declaratory relief "is appropriate when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and when it will terminate and afford relief from the

---

[7] S&L says that it paid the S&L Plaintiffs all its outstanding deferred compensation obligations on September 21, 2021. (*See generally* Decl. of Matthew W. Smith, Sept. 27, 2021 [ECF No. 118].) The court discussed these payments with the parties at the summary judgment hearing. (Rough Summ. J. Hr'g Tr. at 16:17–17:21; 27:9–20.) The S&L Plaintiffs complained that these payments were subject to withholdings to which past deferred compensation payments had not been subject. (*Id.* at 17:5–12.) And they specifically asked the court to impose pre-payment interest to compensate them for the lost time-value of the money. (*Id.* at 17:12–19.) Although the court is granting summary judgment to the S&L Plaintiffs on their breach of contract claims, in light of this development, the court is not in a position to determine the full amount of Plaintiffs' damages. Accordingly, the court, following the entry of summary judgment, will defer the damages-calculation issue to Magistrate Judge Ballou on a Report and Recommendation.

uncertainty, insecurity, and controversy giving rise to the proceeding." *Penn-America Ins. Co. v. Coffey*, 368 F.3d 409, 412 (4th Cir. 2004) (cleaned up). The court exercises discretion when deciding whether to grant declaratory relief. *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.2d 290, 297 (4th Cir. 2005).

The S&L Plaintiffs assert that they need the declaratory judgments to "clarify[] their rights to future monthly benefits for the amounts undisputed by the SERP Defendants." (S&L Pls.' Reply Mem. in Supp. of Mot. for Summ. J. at 9–10 [ECF No. 114].)[8] The S&L Defendants make three arguments in response. First, they contend that the SERP itself is subject to amendment and termination. Either method, the argument goes, would end any future payment of the plan's "conditional" benefits. (S&L Defs.' Opp'n to S&L Pls.' Mot. for Summ. J. at 9 [ECF No. at 111].) Because those future payments are voidable, a declaratory judgment concluding otherwise would be inappropriate. Next, they argue that when S&L purchased SFC's assets, the relevant Asset Purchase Agreement ("APA") capped S&L's liability under the SERP. (*Id.* at 10; APA at 11 [ECF No.111-2].) Finally, they argue that there is no need for a declaratory judgment because the SERP's terms are clear, both parties agree to the schedule on which benefits accrue to the Plaintiffs, and—given S&L's recent payment (*see* Smith Decl. ¶ 5)—the SERP plan is more or less current in its obligations to Plaintiffs. In short, there is no confusion, ambiguity, or uncertainty for a declaratory judgment to resolve.

The court disagrees. This is an appropriate case for declaratory relief. Read in context,

---

[8] The Stanley Defendants do not make any arguments opposing the entry of a declaratory judgment regarding Plaintiffs' future scheduled payments under the DCP in their opposition to summary judgment motion. Any such argument is thus waived. *Cox*, 859 F.3d at 308 n.2. A declaratory judgment will be granted to the Stanley Plaintiffs, resolving that their deferred compensation payments will continue to accrue as scheduled under the DCP's terms.

the first two arguments are belied by the SERP's plain terms. Turning first to the amendment and termination provisions, the SERP states:

> Amendment of Plan – The Board reserves the right at any time and from time to time retroactively if deemed necessary or appropriate to amend or modify, in whole or in part, any or all of the provisions of the Plan; provided that *no such modification or amendment shall adversely affect the right and benefits accrued by Participants under the Plan prior to the effective date of such amendment or modification.*

> Termination of Plan – The Board may terminate the Plan for any reason or no reason at any time provided that *such termination shall not adversely affect the right and benefits accrued by Participants under the Plan prior to the effective date of such termination.*

(*See* SERP at 15 [ECF. No. 24-2] (emphasis added).) This language does not permit the S&L Defendants to abrogate committed compensation, nor does it permit the S&L Defendants to cancel or reduce the S&L Plaintiffs' deferred compensation payments. Indeed, it explicitly says that, whatever the S&L Defendants may do, they may *not* do that.

The S&L Defendants further object to the declaratory judgment on the grounds that they capped the amount of deferred compensation for which they were responsible as a condition of their assumption of the obligations under the SERP as part of the APA. (S&L Defs.' Opp'n to S&L Pls.' Mot. for Summ. J. at 10.) The purchase agreement confirms their intention. S&L and SFC agreed that S&L would assume all of SFC's liabilities and obligations under the SERP "as they are payable under such plan and that do not exceed in the aggregate [] $1,779,939." (APA at 11.)

That argument, however, does not impact Plaintiff's *entitlement* to continued SERP benefits; rather, it only addresses whether SFC or S&L is the party *responsible* for paying those benefits. As an initial matter, the court is dubious that a company can jilt the beneficiaries of

its ERISA plan by later capping a successor in interest's liability in a separate contractual agreement. One party cannot unilaterally modify a contract. *See, e.g., Brown v. Brown*, 674 S.E.2d 597, 599 (Va. Ct. App. 2009); *Edwards v. JPMorgan Chase Bank, N.A.*, No. 1:20-cv-128, 2020 WL 1814423, at *2 (M.D.N.C. Apr. 9, 2020) (applying North Carolina law).

In any event, the record indicates that Plaintiffs are not close to hitting S&L's purported cap. The briefs do not address how much the SERP has paid out since S&L took it over, but the record indicates that the S&L Plaintiffs are collectively due about $6,300 each month, and all the SERP plan's beneficiaries cumulatively receive around $13,000. (SJ Mem. at 6; Dep. of Matthew Smith ("S&L 30(b)(6) Dep.") 42:8–18, July 7, 2021.) S&L has been responsible for the SERP since approximately September 2018—around 36 months. (APA at 5.) That suggests that S&L's expenditures to date are approximately $468,000. Whatever the exact number, the important thing is that the S&L Plaintiffs are not in danger of hitting the purported cap anytime soon.[9] Because the S&L Defendants have not reached the cap on their obligations, this argument does not excuse their noncompliance with the terms of the SERP.

Finally, the S&L Defendants argue that no useful purpose would be served by a declaratory judgment. The parties have had a contract for over three years now and S&L is up to date on its obligations.[10]

But that argument elides two problems. First, the SERP argues that S&L Plaintiffs do not need a declaratory judgment despite avoiding its contractual obligations for more than a year—from April 2020 to September 2021. (SJ Mem at 5; *see* Smith Decl. ¶¶ 1–3.) While the

---

[9] And given the advanced age of many of the beneficiaries, it is possible that they will never reach the cap.

[10] Or it is close to being caught up on its deferred compensation payments. *See supra* n.7.

S&L Plaintiffs may not "need" a declaration of their rights, the S&L Defendants, given the events of the past two years and the positions taken during this litigation, apparently do need the court to clarify their obligations. Accordingly, because it will prevent Defendants from raising the same, or similar, arguments in the future to avoid making additional payments, the court finds that a declaratory judgment is warranted.

Second, ERISA is a remedial statute designed, in part, to protect retirees and older workers. *Massachusetts v. Morash*, 490 U.S. 107, 112 (1989). ERISA explicitly makes declaratory relief available to plaintiffs in the S&L Plaintiffs' situation. 29 U.S.C. § 1132(a)(1)(B). Declaratory relief would protect S&L Plaintiffs from future delays in payment and prevent S&L from arguing that those payments were conditional, thus furthering ERISA's remedial purpose.

The S&L Plaintiffs are entitled to a declaratory judgment for their deferred compensation payments under the SERP's terms.

### D. Pre-Judgment Interest

Plaintiffs ask the court to award prejudgment interest on their past due benefits. "ERISA does not specifically provide for pre-judgment interest, and absent a statutory mandate the award of pre-judgment interest is discretionary with the trial court." *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1030 (4th Cir. 1993) (en banc). "The rate of pre-judgment interest for cases involving federal questions is a matter left to the discretion of the district court." *Nahigian v. Juno-Loudon, LLC*, 667 F.3d 579 (4th Cir. 2012) (alteration omitted). "The essential rationale for awarding prejudgment interest is to ensure that an injured party is fully compensated for its loss." *Roark v. Universal Fibers, Inc.*, No. 1:16cv40, 2017 WL 19091977, at

*6 (W.D. Va. May 9, 2017) (quoting *City of Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 195 (1995) (alteration declined). Plaintiffs persuasively noted at the hearing on this motion that prejudgment interest was appropriate because they had deferred income precisely to take advantage of interest rates in the meantime. (Rough Summ. J. Hr'g Tr. at 14:12–15.)

The DCP explicitly states that Virginia law governs its construction. (DCP at 14.) The SERP was enacted in Virginia, which means that it is also governed by Virginia law. *See Klein v. Verizon Commc'ns, Inc.*, 674 F App'x 304, 307–08 (4th Cir. 2017) (per curiam). Virginia has set its prejudgment interest rate at six percent. Va. Code Ann. §§ 6.2-302; 8.01-382. This court frequently awards ERISA plaintiffs prejudgment interest at that rate, *see, e.g.*, *Roark*, 2017 WL 1901977, at *6; *McIntyre v. Aetna Life Ins. Co.*, 581 F.Supp.2d 749, 762 (W.D. Va. 2008), and the Fourth Circuit has endorsed that practice, *see Quesinberry*, 987 F.2d at 1030–31 (affirming an award of prejudgment interest at Virginia's statutory rate to an ERISA plaintiff). The court sees no reason to test-drive a new standard in this case.[11] The court will grant Plaintiffs prejudgment interest at Virginia's six percent rate.

### E. Attorneys' Fees

ERISA gives district courts discretion to award reasonable attorneys' fees. *See* 29 U.S.C. § 1132(g)(1); *Plasterers' Loc. Union No. 96 Pension Plan v. Pepper*, 663 F.3d 210, 221–22 (4th Cir. 2011). The court must first determine whether either party is eligible for an award of attorneys'

---

[11] Plaintiffs ask the court to award prejudgment interest at North Carolina's higher rate of eight percent. *See* N.C. Gen. Stat. Ann. §§ 24-1; 24-5. They argue that that rate is appropriate because many of the Plaintiffs now reside in that state and that both Stanley and S&L maintain offices there. (SJ Mem. at 2 n.2.) But Plaintiffs do not provide the court with any authority explaining that the prejudgment interest rate is determined by either the state where some of a plan's beneficiaries reside or where the plan's managers do business. Absent authority to the contrary, and because the operative plans incorporate Virginia's rate, the court declines to apply North Carolina's eight percent prejudgment interest rate.

fees under *Hardt v. Reliance Standard Life Insurance Co.*, 560 U.S. 242 (2010). *Pepper*, 663 F.3d at 223. Then, if a party is eligible, the court must analyze the *Quesinberry* factors to determine whether an award is appropriate. *Id.*

"[A] fees claimant must show some degree of success on the merits before a court may award attorney's fees under § 1132(g)(1)." *Hardt*, 560 U.S. at 255 (internal quotation marks omitted). Here, the Plaintiffs have won a judgment worth more than $600,000, two declaratory judgments, and prejudgment interest. Thus, the court concludes that they have secured "some degree of success on the merits." *See Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 634–35 (4th Cir. 2010) (affirming the district court's determination that a plaintiff who had won summary judgment was eligible for attorneys' fees under *Hardt*).

Although Plaintiffs are eligible for attorneys' fees, the court retains discretion to deny such an award. *See id.* at 635–36. The court must analyze the *Quesinberry* factors to determine whether such an award is warranted. Those factors are:

(1) the degree of opposing parties' culpability or bad faith;

(2) the ability of opposing parties to satisfy an award of attorneys' fees;

(3) whether an award of attorneys' fees against the opposing parties would deter other persons acting under similar circumstances;

(4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and

(5) the relative merits of the parties' positions.

*Id.* (quoting *Quesinberry*, 987 F.2d at 1029). These factors are "general guidelines"; they do not set out a "rigid test." *Pepper*, 663 F.3d at 223 (quoting *Williams*, 609 F.3d at 636).

The parties dispute each factor. For the reasons given below, the court finds that the

four of the five *Quesinberry* factors weigh in favor of the Defendants and that attorneys' fees are not warranted. The court will address each factor specifically.

    *1. Bad faith.* A lack of bad faith cuts in Defendants' favor. S&L's recent payment, for obvious reasons, evinces good faith. Although the Stanley Defendants have not made any payment since a partial payment in August 2020. But in light of their financial stress, nonpayment, by itself, is insufficient for this court to find that they have acted in bad faith. (*See* Am. Compl. ¶ 76 [ECF No. 24]; Answer ¶ 76 [ECF No. 60].) Although business is struggling presently, SFC reiterated in the deposition of its corporate representative that resuming full operations is the only way that the Stanley Plaintiffs may end up being paid in full. (SFC 30(b)(6) Dep. at 40:1–17, 80:1–4.) In the meantime, SFC has negotiated in good faith to settle this case, which would give the Stanley Defendants something—not everything they are owed, but likely more than they would receive in a bankruptcy. (*Id.*) The court finds that the S&L Defendants and the Stanley Defendants, although litigating zealously, have not acted in bad faith.

    *2. Ability to Pay.* Ability to pay also favors Defendants. At the end of last year, both Defendants were flirting with insolvency. During discovery, each company stated under oath that it had recently contemplated bankruptcy. (SFC 30(b)(6) Dep. 79:20–21; *see* S&L 30(b)(6) Dep. 25:10–20.) Their financial statements confirm this precarity. SFC had only $23,009 in cash on hand in January 2020. (SFC Financial Statements at 2 [ECF No. 108-6].) That's 26 times less than what it currently owes Plaintiffs. (*Compare id.*, *with* SJ Mem. at 4.) And it's a whopping *517 times* less than SFC's liabilities at that time. (*See* SFC Financial Statements at 2.) Given those obligations, SFC is not in a financial position to make the SFC Plaintiffs whole,

much less satisfy an additional award for attorneys' fees.

At the hearing on their motion for summary judgment, Plaintiffs pushed back on this argument. They note that SFC has been distressed for years now, but that wealthy firms have invested in SFC to keep it afloat. Given these apparent lifelines, the argument goes, it is clear that SFC can pay the Plaintiffs. But the test is not whether companies with an interest in the opposing party can afford to pay a plaintiff's attorneys' fees. Nor should it be; that SFC has avoided bankruptcy only because its investors have kept it on life support undercuts the argument that SFC itself can afford to pay an award of attorneys' fees.

This factor is a little more complicated as to S&L, which recently made (or came close to making) the S&L Plaintiffs whole. But, aware that the payment to the S&L Plaintiffs came on the eve of a summary judgment hearing, the court is unwilling to find that S&L has the ability to pay a grant of attorneys' fees. At the end of last year, S&L had $19,374 cash on hand. (S&L Financial Statements at 3.) But it also owed its creditors $974,793. (*Id.*) And S&L said that this recent payment required a plan beneficiary to further delay his own payments so S&L could catch up on its payments to the other beneficiaries. (Decl. of Matthew W. Smith, Sept. 27, 2021 ¶ 5 n.1 [ECF No. 118].) The company deserves some discretion over which of its obligations are most critical as it returns to profitability. The court therefore finds, on this record, that S&L could not satisfy an award of attorneys' fees.

*3. General deterrence.* The third factor is general deterrence. The court must decide whether an award of attorneys' fees would deter companies similarly situated to S&L and Stanley from withholding deferred compensation payments. The court concludes it would not. Again, S&L and SFC are distressed companies. Such companies must make difficult decisions

about which creditors to pay, whether to pay them in full, and in what order. Plaintiffs are no more entitled to their deferred compensation than other creditors are to their payments. The court finds that an award of attorneys' fees would not have a beneficial, general-deterrent effect. *Compare DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 877 (4th Cir. 2011) (after a plaintiff successfully overturned the denial of his disability claim, the court found that an award of attorneys' fees would deter similar denials).

   *4. Significance.* The fourth factor, broadly speaking, addresses the significance of a particular ERISA case, and it gauges significance in two ways. First, do the Plaintiffs represent every participant in the plan; and second, are they litigating a significant legal question regarding ERISA? Neither condition is met here. The parties agree that some DCP beneficiaries and some SERP beneficiaries are not Plaintiffs. (Stanley Defs.' Br. in Opp'n to Mot. for Summ. J. at 8 & n.2; S&L Defs.' Opp'n to S&L Pls.' Mot. for Summ. J. at 13; S&L Pls.' Reply Mem. in Supp. of Mot. for Summ. J. at 16; Stanley Pls.' Reply Mem. in Supp. of Mot. for Summ. J. at 12 [ECF No. 112].) Nor does Plaintiffs' case involve a novel or complex question about ERISA. Plaintiffs are entitled to benefits under the plain and unambiguous terms of the plan at issue, and Plaintiffs' counsel successfully vindicated that position at summary judgment. Although the impossibility doctrine's applicability to ERISA plans remains unsettled, *Defendants* raised that argument, not Plaintiffs. As explained above, the defense fails here, so the question of whether impossibility is available to Defendants is not determinative in this case. *See supra* n.5.

   *5. Relative Merits.* Only the relative merits of the parties' positions weigh in Plaintiffs' favor. Plaintiffs have won more than $600,000, two declaratory judgments, and prejudgment

interest; the merits overwhelmingly favor them. *See Williams*, 609 F.3d at 634–35.

On balance, the *Quesinberry* factors favor Defendants. The court will deny Plaintiffs' request for attorneys' fees.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment (ECF No. 107) will be granted. Plaintiffs are entitled to their deferred compensation payments under the schedule and terms laid out in the SERP and DCP, respectively. The court will refer this matter to the Hon. Robert S. Ballou for further proceedings to calculate the amount of deferred compensation owed based on the grant of summary judgment and to prepare a Report and Recommendation regarding the same. The court will assess six percent prejudgment interest against the Defendants. The parties are responsible for payment of their own attorneys' fees and costs.

The Clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 14th day of October, 2021.

*/s/ Thomas T. Cullen*
_____
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE